## Case No. 15,601.

UNITED STATES v. LIMANTOUR (two cases).

[Hoff. Land. Cas. 389.] [1]

District Court, N. D. California. June Term, 1858.

MEXICAN LAND GRANTS — FRAUDULENT CLAIMS.

These claims rejected on the ground that the alleged grants are fraudulent and antedated.

These claims were both confirmed by the board, appealed by the United States, and tried together before the district court.

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

[These were claims by José Y. Limantour for four square leagues in San Francisco county, supposed to extend south of California street. Grant claimed from Manuel Micheltorena to Limantour February 27, 1843. Also, claim by same for the islands of Los Farallones, Alcatraz, and Yerba Buena, and a tract of one square league in Marin county, opposite the island of Los Angeles, known as "Punta del Tiburon." Grant claimed from same to same December 16, 1843. These grants were confirmed by commission on January 22 and February 12, 1856.]

P. Della Torre, U. S. Atty., and Edwin M. Stanton, for the United States.

James Wilson and Whitcomb, Pringle & Felton, for appellees.

HOFFMAN, District Judge. The claimant in these cases asks a confirmation of his titles, alleged to be derived from two grants made to him by Governor Micheltorena in 1843. The first is for four square leagues of land situated in San Francisco county. The second is for the islands of Los Farallones, Alcatraz and Yerba Buena, and for one square league of land, a little more or less, at Point Tiburon, in the strait of the island of Los Angeles. The two cases have been heard together, and the evidence taken has, by agreement, been made applicable to both.

In support of the claim for the four leagues, the following documentary evidence has been produced: (1) A grant of four leagues in the present county of San Francisco, made by Manuel Micheltorena, and dated February 27, 1843. On the margin of this grant is an approval or confirmation, signed Bocanegra, and dated April 18, 1843. (2) A letter, signed by Micheltorena, and dated at Los Angeles, January 8, 1843, addressed to José Y. Limantour, stating the governor's want of resources, soliciting assistance, and offering to compensate him by grants of land. (3) A certificate, signed by Micheltorena and by Jimeno, secretary, dated December 25, 1843, in which is recited a letter received by Micheltorena from Bocanegra, minister of exterior relations and government of Mexico, and dated Mexico, October 7, 1843. In this communication Bocanegra acknowledges the receipt of an official note by Micheltorena, dated February 24, 1843, enclosing the memorial of Limantour, and he announces to the governor that the supreme government has "been pleased to grant to Limantour sufficient leave to acquire, besides the property which he has already acquired, and which has been recognized by the supreme government, further country, town, or any other kind of property." (4) A copy of an expediente, the original of which was found by Vicente P. Gomez, in the office of the recorder of Monterey county. This expediente contains a petition of Limantour, dated January 10, 1843, a marginal order of reference, signed

by Micheltorena, dated January 11, 1843, and a decree of concession, dated February 25, 1843, two days before the date of the grant produced in evidence. (5) An official communication from Manuel Jimeno, written, as it recites, by order of the governor, and addressed to William A. Richardson, captain of the port of San Francisco, and dated January 14, 1843. In this communication the boundaries of the land solicited by Limantour are described, and information relative to those lands is required of Richardson, who is also directed to furnish a map. (6) A letter from M. G. Vallejo to Wm. A. Richardson, and dated November 7, 1843. This letter is produced by Richardson, and will hereafter be noticed.

In support of the Islands grant, the claimant has produced the following documents: (1) A grant signed by Micheltorena, and dated December 16, 1843. On the margin of this grant is an approval or confirmation, signed by Bocanegra, and dated Mexico, March 1, 1844. (2) An expediente from the archives, containing the petition of Limantour, dated December 12, 1843, with a marginal decree by Governor Micheltorena, dated December 14, 1843, granting the land asked for, and which is described on the diseño. There has also been produced by Manuel Castañares, a witness examined in this court, a copy of a document purporting to be on file in the archives of the ministry of protection, colonization and industry of the Mexican republic. This document purports to be a minute, or direction in obedience to which the communication to Governor Micheltorena, recited by him in the certificate already alluded to, was written. To this minute is attached the rubric of Bocanegra. Appended to it is a memorandum, or advertencia, also rubricated by Bocanegra, which will hereafter be adverted to. There have also been produced two letters from Mariano Arista, president of Mexico, addressed respectively to the governor of this state, and to the land commissioners, in which the claims of Limantour are commended to their favorable consideration. These letters are dated October 2, 1852.

It is contended on the part of the United States, that all the documents on which the claimant relies are false and forged, and that they were fraudulently fabricated long after their pretended dates, and after the acquisition of California by the United States. The charge is grave. It requires and has received the most careful consideration. The first of the claims now presented for adjudication is for four square leagues of land in the present county of San Francisco. It embraces the greater part of the northern extremity of the peninsula on which this city is situated, and it includes about three-fourths of the city, of an assessed value of about $15,000,000. with its wharves, streets, markets, etc. The Islands claim comprises: That island of Yerba Bue-

na, which lies opposite to and commands the city and port of San Francisco; the island of Alcatraz, a small and barren rock which commands the entrance to the Golden Gate, and which is the site of important defensive works erected by the United States; the island of the Farallones, which lies opposite the Golden Gate, and at some distance from the mouth of the harbor, and on which the United States have erected one of the most important light houses on the coast; and, finally, the point of Tiburon, which commands the strait between the island of Los Angeles and the main land, by which vessels avoiding the city of San Francisco are enabled to reach the northern waters of the bay and its tributaries.

In addition to the claims under consideration, José Y. Limantour presented to the board of commissioners six other claims, of which he asked confirmation. These claims were: One for eleven square leagues, called "Laguna de Tache." One for eleven square leagues, called "Lup Yomi." One for eighty square leagues, near Cape Mendocino. One for the vineyard of San Francisco Solano. One for six square leagues, called "Cahuenga." One for eleven square leagues, called "Cienaga de Gabilan," alleged to have been granted to one Chaves, and assigned to Limantour. All these last claims were rejected by the board. No appeals have been prosecuted in this court, and they appear to have been abandoned by the claimant.

All these claims, and the two now submitted, are in form separate, but they are in many respects so closely connected, that those before this court cannot be considered without reference to them. The six claims referred to embrace one hundred and thirty-four square leagues of land, or nine hundred and twenty-four and thirty-four one hundredths square miles, or five hundred and ninety-four thousand seven hundred and eighty-three and thirty-eight one hundredths square acres. They all purport to have been made within a period of about sixteen months, and are, with the exception of the grant for the vineyard of San Francisco Solano, founded on the same consideration, viz., the great services of the grantee to the department in money and goods. If these immense and extraordinary concessions were in fact made by Governor Micheltorena, and if the advances in money and goods, on which they were founded had in fact been furnished by Limantour, it would naturally be expected that the records of the government, and the correspondence of its officers, would furnish abundant allusions to the transactions. How far that expectation is realized in this case will subsequently appear.

By the decree of March 11, 1842, the jealous and exclusive policy which had prohibited the acquisition of lands by foreigners within the Mexican territory was in some degree relaxed, and they were authorized to

acquire such property within the central department of the republic. This privilege, however, did not extend to the frontier departments, in which they could acquire lands only by express permission of the supreme government. The singular advantages presented by the bay and harbor of San Francisco for commercial purposes, had, long before the date of the grants to Limantour, attracted the attention not only of foreigners, but of the more intelligent of the native population. So early as 1837, General Vallejo had, in a memoir or exposition addressed to the departmental authorities, brought to their attention the great commercial advantages of the bay and its tributaries, and had particularly remarked the importance of the point of Tiburon and the islands of Alcatraz and Yerba Buena for the military defense of the harbor. The record in this case discloses that just previous to the date of these grants, a plan had been proposed to transfer the custom house from Monterey to this port, and to establish at the latter naval arsenals and schools. The islands solicited by Limantour, particularly those of Alcatraz and the Farallones, were almost without value to a private individual, if retained for his own use. When, therefore, he solicited and the governor granted them, it must have been contemplated by both that they would subsequently be repurchased by the government, as indispensable to the fortifications of the harbor; for in that way alone could the grantee have hoped to derive any advantage from their acquisition. The lands embraced in the four-league grant were also in great part unfit for agricultural purposes, and they could only have been desired by Limantour from their prospective value as the site of an important town.

The case, then, as stated by the claimant, is extraordinary and surprising. That a governor of California should not only have so widely departed from the ancient and traditional policy of his country with regard to foreigners as to make the enormous concessions which have been offered for confirmation by the claimant, but that he should have granted to him the site of a future town, upon the most important bay of the coast, and added thereto a grant of all the islands and military positions which command the approach or the entrance to the harbor, strikes us at the outset as a circumstance astonishing if not incredible. Among the accusations brought against General Micheltorena after his overthrow and expulsion from the country, it is strange that so just and so popular a ground of animadversion as such grants as these to a foreigner would have afforded, should have been wholly omitted. And it is still more strange that the archives should fail to show the slightest trace of his action on the subject, either in his official correspondence with the supreme government, or with his own subordinates. These considerations are at least sufficient to justify us in approaching the examination of the evidence in support of these claims with surprise if not with suspicion. The documentary evidence in support of the four-league grant, on which the chief reliance is placed, consists of the grant itself and the expedientes.

1. As to the grant. The handwriting of the grant is stated by Arce, Prudon and Abrego, three of the claimant's witnesses, to be that of one Maciel, a captain in Micheltorena's command, who was sometimes employed by him to write in the office. On the other hand, it is testified by A. Jouan and F. Jacomet, witnesses on the part of the United States, that the writing is that of E. Letanneur, a clerk in the employment of Limantour about the year 1852. Letanneur himself is proved to have confessed the fact, when interrogated before the grand jury of this county; but his subsequent denial of it, when examined as a witness for the claimant, and the circumstances under which the confession was made, deprive it of any great weight as evidence in the case. But the testimony of Jouan and Jacomet is confirmed by other proofs. In the archives at Monterey is found the record of a criminal proceeding, in which a document purporting to be written by Maciel is found. The handwriting of this document in no respect resembles that of the grants in these cases. Francisco Sanchez testifies that he knew Maciel, and has seen him write. With a scrupulousness that adds force to his testimony, he declines to say that he remembers his handwriting well enough to say that he knows it. He states, however, that "it appears to him that Maciel did not write the document; that he was an educated man, and that no Spaniard would use the word 'estacado' as it is written in that paper." Benito Diaz testifies that he has seen Maciel's handwriting on several occasions, but is not particularly acquainted with it; that he cannot compare the writing of the document with that of Maciel, because he does not remember the latter sufficiently, but from its tenor and style, he does not believe it to be his; that it contains errors such as Maciel would not have made, and he particularizes the circumflex over the word "linea," the use of the words "fundadero" instead of "fondeadero," "estacado" for "estacada," and "podro" for "podra." But the most significant circumstance connected with the writing of these grants is the fact that the Yerba Buena grant and the Islands grant are in the same handwriting, and this, although one is dated at Los Angeles, and the other at Monterey ten months afterwards, and that among all the archives found in the surveyor general's office, no writing similar to this is found. If Maciel, who it is admitted was only employed occasionally in the governor's office, wrote these two grants at different places, after

so long an interval, with the mistakes which have been mentioned, and then abruptly desisted from his labors, it was surely a most singular coincidence.

The expediente produced in the four-league grant is stated by Vicente Gomez to have been found by him accidentally in the office of the recorder of Monterey, in the year 1853. This witness testifies that, at the request of José Castro, he went to the office of the recorder to examine the papers in reference to some property of the former; that while so engaged he discovered the expediente now produced; that after finding it he consulted José Abrego, who advised him to take a copy of it, which he did. W. I. Johnson testifies that he held the offices of recorder and deputy county clerk in Monterey from April, 1850, until June, 1853, and had charge of all the archives or records relating to lands; that pursuant to an act of the legislature of this state, he examined all the archives under his charge, but that he found no such paper as that discovered by Gomez; that if there had been any such he thinks he would have found it, and would certainly have remembered it. He further states that he first heard that Limantour claimed a tract of land in San Francisco from Gomez, who said to him that he believed José Abrego was concerned in it, and that to his (Gomez's) knowledge, it was a fraudulent claim; that immediately after this conversation he again carefully examined the archives relating to land titles, but found no document of the kind now produced. Philip A. Roach testifies that in 1850 he, together with Mr. Ripley, who was elected recorder, were appointed a committee to examine the papers in the recorder's office, and to separate those which would belong to the county from those relating to the city, and that in the discharge of those duties he examined all the papers in the office; that subsequently he examined them all a second time when searching for an expediente relating to a rancho in Monterey, but that on neither occasion did he discover the document now produced, and that he does not think such a paper could have escaped his attention.

It is admitted by Gomez, and the fact is unquestionable, that the proper and regular place of custody of such documents as that found by him, was the office of the secretary of state, and not that of the alcalde, the records of which were transferred to the recorder's office. Mr. Hartnell, who, during the existence of the military government in this country, held the situation of government translator, and who made an index of all the California land grants he could find, testifies that he only heard of the existence of the grant to Limantour, by public rumor, in the year 1853; and, finally, Mr. Selim E. Woodworth states that he made a general examination of all the archives in 1850; that being desirous to ascertain the limits of the pueblo of Monterey, he examined every paper and book in the office of the alcalde, and that he did not see among them the expediente subsequently found by Gomez.

To corroborate Gomez, the claimant has taken the testimony of Florencio Serrano. This witness describes accurately the expediente as now produced, and states that he saw it in the archives of his office when he was judge, in 1848 or 1849. On his cross-examination he states that he never saw the document or a copy of it from that time until it was exhibited to him in court, December 8, 1855. The falsehood of this declaration is proved by the testimony of the county recorder, Mr. Williams. This officer states that on the 5th of December Serrano called at his office and asked for the petition of Limantour; that he handed him the expediente, which he read attentively; that a few days afterwards he read in a newspaper the testimony given by Serrano, and at once remembered that he had been in the recorder's office, but he could not recollect when. On retiring for the night, he remembered that he had made a charge in his books for searching for the paper, and the next morning, on referring to his books, he found the entry under date of December 5, 1855, "Search for Limantour grant, fifty cents." The exposure of this gross falsehood on the part of Serrano, not only destroys his credibility as to the more material fact to which he testifies, but the attempted deception confirms our suspicions as to the truth of the statement of Gomez. If to the testimony of Johnson, Roach, Woodworth and Hartnell, be added the circumstance that Gomez, immediately on discovering the expediente, suspended his search for Castro's papers, which he never afterwards resumed, and that his statement with regard to his consultation with Abrego is unconfirmed if not absolutely contradicted by the latter, we are justified in asserting that this claim can derive little support from documents discovered and produced under circumstances so suspicious. How far any statement of Gomez is entitled to credit will hereafter more fully appear.

The expediente thus presented for consideration consists, as has been stated, of a petition in the writing of Limantour, and a marginal order and a decree of concession in the writing of Micheltorena. The marginal order directs, in the usual form, a reference "to the proper judge," and the decree of concession recites that "the proper judge having taken all the steps and investigations," etc., there is granted to José Y. Limantour the tract mentioned in his petition. The judges in the jurisdiction of Yerba Buena, in the years 1842 and 1843, were Francisco Sanchez, first alcalde, and José de Jesus Noé, second alcalde. If, then, as the marginal order directs, and the decree of concession asserts, the petition of Limantour was referred to the respective judges, the reference should have been to one of these

officers. But no trace of any report by them exists, either in the expediente, where such informes are usually found, or in any document whatever in the archives. Noé himself testifies that neither during the year 1843, nor at any other time, was he called upon for an informe in relation to land near the pueblo of Yerba Buena solicited by Limantour, and that he never had heard of any claim by Limantour to such lands until 1852. Francisco Sanchez makes the same statement, and adds that in 1844 Limantour petitioned for lands near the Mission Dolores, at a place called "Los Canutales," and was refused because he was a foreigner; that he heard of Limantour's claiming lands in California in 1852 for the first time. The testimony of these witnesses is confirmed by the records of their official action.

On the 13th of May, 1846, Enrique Fitch and Francisco Guerrero petitioned for two and one-half square leagues of land in the point of the presidio of San Francisco. This land is within the limits of the tract alleged to have been granted to Limantour. The petition was referred to the prefect, Manuel Castro, who appears to have referred it to the first justice of the peace, José Jesus Noé. The expediente contains the report of the latter, stating that the land is vacant; and also the informe of Castro, advising the governor that the land may be granted. It is also shown by the expediente in the case of Benito Diaz, that on the 24th of May, 1845, he petitioned for two square leagues of land called "Punta de Lobos," a great part of which is included within the limits of the Limantour grant. The usual reference having been made to the respective judge and the military commandant, both of those officers report that the land is vacant, and can be granted. The judge who signs the informe is José de la Cruz Sanchez, and the military commandant is Francisco Sanchez. It thus appears that not only no reference was made of Limantour's petition to the respective judge, as is recited in the decree of concession, but that the statement of the two alcaldes that they have never heard of any grant to him is corroborated by their official reports as found in the archives.

But the claimant contends that the informes on which the govenor acted were obtained from Wm. A. Richardson and Francisco de Haro. To establish this, Richardson has been examined. This witness states that about the latter part of January, 1843, he received by the hands of the former magistrate of San Francisco, Don Francisco de Haro, a communication from Manuel Jimeno, which he produces; that at the same time De Haro showed him a communication on the same subject addressed to himself; that he answered the communication sent to himself, and prepared a map which he transmitted with his reply to the governor. At the time of this transaction Richardson was captain of the port of San Francisco, but re-

sided on the northern side of the bay, at Saucelito. The duties of that office are detailed by Escriche (ap. verb. 415). They relate chiefly to the visiting and inspection of vessels and the prevention of smuggling. They appear to have had no reference to the granting of lands. A reference therefore to Richardson for the information required, was a departure from the invariable practice of the governor in similar cases, and the fact of such a reference in this case, is on other grounds extremely improbable. The archives show that on the very day on which this letter of Jimeno purports to have been written, Manuel Castañares, the administrator of the custom house, addressed a letter to Micheltorena complaining of Richardson's official misconduct, and charging him with smuggling, and that in about a month thereafter Richardson was removed from office. There is also produced by Richardson a letter signed by M. G. Vallejo, and dated November 7, 1843.

The proof of the authenticity of these letters rests on the testimony of Richardson and Arce. General Vallejo, though a resident of this country, has not been called to establish the genuineness of the letter attributed to him, or to explain the circumstances under which it was written. Admitting it, however, to be genuine, its language seems to indicate that the writer was at its date ignorant that Limantour had obtained any grants from the government. After alluding to the fact that "our friend, the notorious Limantour," had furnished large sums to Gen. Micheltorena, it adds, "if he does not intrigue, at least he endeavors to obtain some grants in that (Punta de Reyes) and other places, taking advantage," etc. Such language would surely not have been used had the writer been aware that a grant of four leagues in the port of San Francisco had already been made to Limantour, and approved by the supreme government. But Manuel Jimeno himself has been examined as a witness. It is a significant circumstance that neither the letter produced by Richardson, nor the certificate of Micheltorena reciting the communication of Bocanegra, and which purports to be attested by Jimeno, were exhibited to the latter.

In reply to a question whether, on Gov. Micheltorena's arrival in Monterey, (in August, 1843) he understood from him (Gov. Micheltorena) that he had made a grant of lands to Limantour, he replies: "I did not so understand from Gov. Micheltorena." He further states that he never heard Gov. Micheltorena say that he had granted lands to Limantour adjoining the pueblo of San Francisco, and that he does not know that such grant was made. He adds, however, that he recollects that as secretary he asked for information respecting lands petitioned for by Limantour. Of what authority he asked this information he does not recollect. Two of the grants presented by Limantour

to the board, and which were rejected, and have been abandoned by him, bear the signature of Jimeno as secretary. They are dated December 4, 1843, and December 20, 1844; one is for eleven square leagues, the other for eighty square leagues. The certificate of Micheltorena, attested by Jimeno, before referred to. is dated December 25, 1843. The reasons for considering all these documents antedated and fabricated will hereafter appear. It is sufficient for the present to observe, that if they are genuine and were signed by Jimeno, it is impossible that he should not have known and remembered that such extensive and extraordinary grants had been made.

The testimony of Jimeno exposes the falsehood of the statement made by Gonzales, another of the claimant's witnesses. Gonzales swears that soon after Micheltorena's arrival, he offered to grant to him land at Yerba Buena; that he had received a report on the subject from Prefect Guerrero, from whom, as from other prefects, he had required a statement of the condition of their lands; that the witness did not see the informe, but saw on several petitions the order for an informe, directed to Guerrero; that a short time before Micheltorena went out of office, he (witness) presented a petition for the land, which was, by a marginal order, referred to Jimeno; that Jimeno reported in writing, and that the next day he received back his petition from the hand of Jimeno, with a decree of the governor, stating in substance that the lands could not be granted, as they had already been granted to Limantour. It is unnecessary now to dwell on the various falsehoods contained in the deposition of this witness. His statement that he was administrator of the custom house from 1832 to 1834; that he received an order to remove the custom house to Yerba Buena; that Guerrero was prefect; that Micheltorena removed to Monterey about a month after taking his oath of office, are all disproved by the records now existing of the transactions of the former government. Not only was Guerrero never prefect, but the records have been searched in vain for any petition on which a marginal order of reference to him is found. Had several such existed as asserted by the witness, it is nearly impossible that all could have been lost.

The negative evidence against this grant, afforded by the fact that Jimeno did not know of its existence, is most important. The records of proceedings under Micheltorena's administration, with reference to grants of land, show his uniform and almost invariable habit of referring every application to Jimeno for information and advice. The intelligence, the experience, and the evidently cautious and circumspect disposition of that officer, appear to have given to his recommendations great weight with the governor, and in every instance his advice

seems to have been relied on and implicitly followed by that officer. To suppose, then, that Micheltorena, without consulting Jimeno, would have made to a foreigner a grant which Vicente Gomez says was much "spoken of, because it was a grant of a famous port;" that after doing so he never even mentioned the circumstance to Jimeno, and that up to 1853 Jimeno remained in ignorance of the fact, is to suppose what is almost impossible. That Jimeno could not have forgotten it is I think, obvious. The dilemma is therefore presented: either he swore truly that he did not know it—in which case Gonzales' testimony must be rejected as false, and Jimeno's signature to Micheltorena's certificate be regarded as forged—or else, if Gonzales' testimony be true, and Jimeno's signature genuine, the latter has sworn falsely, when he stated that he did not know that the grant was made. Which of these alternatives is to be adopted by this court will subsequently appear.

But an indirect confirmation of Jimeno's testimony is, however, afforded from another source. Victor Prudon, a witness for the claimant, states that he delivered and read to Limantour the letter from Governor Micheltorena, dated January 8, 1843, in which he solicits assistance from Limantour. The witness then details a conversation with Limantour, in which the latter expressed his intention to ask for lands near Yerba Buena, to which the witness objected that Governor Micheltorena had no power to grant lands to a foreigner. He adds that he and Limantour made a bet on the subject, and when the case was submitted to Micheltorena, the latter convinced him by showing him Santa Anna's decree of 1842, allowing foreigners to hold lands in the Mexican republic; that the petition was then drawn, and he saw it afterwards with Micheltorena's decree of concession, in the secretary's office. If this statement be true the official action of both Micheltorena and Jimeno, in the case of Sparks, is not easily accounted for. By the expediente in that case, produced from the archives, it appears that on the 6th of June, 1843, Sparks, a naturalized Mexican citizen, petitioned for land which he had for some time been allowed to occupy provisionally. The prefect, to whom his petition was referred, reports that. "as the law, in speaking of strangers. prohibits them from acquiring real estate in the republic, if they have not been naturalized therein and married with a Mexican, your excellency will order that which may be proper." On the 5th of July, 1843, Micheltorena orders all the proceedings to be returned to the interested party to await the very shortly expected arrival of the new constitution of the republic; "and when he may know that it has arrived, he will make his application anew."

On the 1st of December, 1843, Sparks renewed his application, on which Jimeno reports, December 5, 1843, as follows: "The

party interested has not acquired the property of the land he petitions for, on account of not being married to a Mexican, as required by the constitution of 1836, and although, by a subsequent decree, foreigners were allowed to acquire real estate in the republic, exceptions are made in the frontier departments. which have been subjected to regulations which have not been received. I believe it would be an act of justice to grant the land to the petitioner, because he is an honorable man " etc. The land was, accordingly, on the 5th of December, ordered to be granted, on the condition that the grantee should have no power to sell it. The evidence afforded by this expediente is important, not only as contradicting or at least discrediting the statement of Prudon, but as indicating the caution and circumspection of both Micheltorena and Jimeno with reference to grants to foreigners. If the grants presented by Limantour be genuine, Micheltorena must have signed and Jimeno attested on the 4th of December, 1843, (the day preceding the date of the latter's report and the order of the governor) a grant to Limantour for eleven square leagues—Laguna de Tache—and on the 16th of December. Micheltorena must have granted to him the islands of the Bay of San Francisco, the paramount military importance of which to the government has already been noticed; and this, though Limantour was neither naturalized nor married to a Mexican.

Had Micheltorena, ten months before, granted to a foreigner the port of Yerba Buena, and had he, on the preceding day, granted to the same foreigner eleven leagues of land under the authority of the law of 1842, the doubts of Jimeno, his ignorance of the regulations prescribed by law, and the condition imposed by Micheltorena in the grant to Sparks, are inexplicable. That Jimeno considered naturalization as an indispensable requisite to a petitioner soliciting a grant, is further evident from the expediente in the case of Sainsevain. The application of this person was, by Micheltorena, referred as usual to Jimeno, on the 20th of November, 1843. That officer on the same day reports: "Don Pedro Sainsevain is not naturalized, an indispensable requisite in order to secure property in this territory." Sainsevain's application was accordingly denied, until, having become naturalized, he obtained a title from Pio Pico in 1846.

But there are other parts of Prudon's deposition which are worthy of notice. He states, as we have seen. that he saw the petition of Limantour, with the decree of concession, "in the secretary's office." On his cross-examination he testifies that Governor Micheltorena "had no civil secretary until he arrived in Monterey." This statement, made evidently with the object of accounting for the absence of the attestation of the secretary to either of the grants now presented, is shown to be untrue. A list of grants purporting to have been made by Micheltorena at Los Angeles in the year 1843, has been prepared from the records on file in the surveyor general's office. Two of these, dated January 27, 1843, are attested by Jimeno as secretary; the remainder. twenty-two in number and of various dates, from January 27 to May 20, 1843, are attested by Francisco Arce. Arce himself states that in January, 1843, Jimeno was secretary of the departmental government of California, and that he himself acted as secretary ad interim under Micheltorena at Los Angeles; and on the 24th of February, 1843, three days previous to the date of the first grant to Limantour, a grant is found in the archives bearing his attestation. The same facts are also testified to by Rafael Sanchez, who was clerk in the office of the military secretary in January, February, March and April, of 1843. This witness states that Jimeno was appointed secretary in January, 1843; that after acting as such a short time, he went to Monterey, and that Arce, his first clerk, acted as secretary during his absence.

With regard to Richardson, to whom, as he says, the letter of Jimeno was addressed, it will hereafter appear that at the time when these documents are supposed by the United States to have been forged, viz. in June, 1852, he was in Mexico, and in frequent communication with Limantour. One statement, however, contained in his deposition may here be noticed. In reply to the seventeenth question, Richardson testifies that when he was in Mexico in 1852, Limantour inquired of him as to the condition of his "lands at Yerba Buena." That upon his (witness') advising him that he ought to send on his documents at once, as the commissioners were in session, Limantour replied that he could present them at any time; that "they were all substantiated by the proof of signatures by the United States consul in the city of Mexico, or the United States minister." In a subsequent part of his deposition, Richardson states that he left San Francisco on the 1st day of June, 1852, and returned to that city on the 29th of July, of the same year, having spent eleven days in the city of Mexico. The conversation with Limantour must, therefore, have occurred some weeks prior to the 29th of July.

It is true that the documents produced by Limantour do bear the certificates of the United States consul at Mexico, attesting the genuineness of the signature of J. Miguel Arroyo, who himself certifies to the genuineness of the signatures of Bocanegra and Micheltorena. But unfortunately the certificates of the consul are dated on the 2d of November, 1852, more than three months after the date of the alleged conversation, in which, according to Richardson, Limantour stated that they had already been obtained.

It is therefore evident that the statement by Richardson of that conversation is untrue. Whether this falsehood was intentional, or is the result of an inaccurate recollection, we will be enabled to judge when the evidence to prove the fraud attempted in these cases has been more fully considered.

It is stated by Prudon that the fact that the lands had been granted to Limantour near Yerba Buena and the Presidio was known, as he believes, to all the principal persons in the country; and he asserts positively that it was known to Alvarado, José Castro, Manuel Castro, Jimeno, Guadalupe and Salvador Vallejo, Arce, Sanchez, and some others. With respect to Jimeno, we have already seen that this statement is contradicted by himself. We have also seen by the expedientes in the case of Fitch and Guerrero, and in that in the case of Benito Diaz. that Manuel Castro, as prefect, in June, 1846, reported a part of the tract embraced within the grant to Limantour as vacant, and that José de la Cruz Sanchez as judge, and Francisco Sanchez as military commandant, made a similar report, on the application of Benito Diaz for a part of the same tract. Rafael Sanchez, who was examined as a witness, states that he does not remember whether or not Micheltorena made any grants of land at Los Angeles.

Alvarado testifies that neither Micheltorena nor Limantour ever told him that any land near Yerba Buena had been granted to the latter. He says, however, that he heard that there had been granted or sold lands to Limantour, and that he had solicited lands at the north, but where he did not hear. Francisco Arce, though examined by the claimant, says nothing on the subject. Guadalupe and Salvador Vallejo have not been examined as witnesses. The only witness who corroborates the statement of Prudon is José Castro, and he merely states that Limantour told him in 1845 that he had no money, having expended it all in purchasing lands near the port of San Francisco. It will hereafter be seen that in 1854, and long subsequently to the date of the alleged grant of lands near Yerba Buena, Limantour received from the Mexican government, in payment of goods furnished to Micheltorena, more than $56,000.

We have thus far directed our attention to various circumstances connected with the grant and expediente in the Yerba Buena case, which suggest suspicions as to their genuineness. We are now to consider the evidence upon which the United States rely as demonstrating, beyond all doubt, the forgery of the titles and the perjury of the witnesses who have testified in support of them. The most imposing, and in many respects most important witness produced by the claimant is Manuel Castañares. The testimony of this witness was taken in this court after the case was appealed. He came, as he states, from Mexico to this country for the purpose of giving his evidence in this cause, and by permission of the president of Mexico, obtained through the intervention of the French minister. The official position and the intelligence of this witness, the clearness and precision of his answers, and the circumstances under which his testimony was given, are such as would naturally commend him to the respectful consideration of the court. It is the discharge of a painful duty to declare that his evidence, in almost every important particular, has been shown to be false, by proofs which amount to demonstration. In reply to the thirty-second question, Castañares states that the paper on which the grants in these cases were written was printed in Monterey, towards the end of the year 1842. That by the laws of Mexico, paper was habilitated for a "bienio," or period of two years; that paper had accordingly been printed for the bienio of 1842 and 1843, but inasmuch as by a new law the prices and uses of stamped paper were changed, it became necessary to have a new impression in conformity with that law for the remaining year of the bienio; that the law making this change was received by him in the latter part of November, or quite early in December, 1842, and that he immediately took measures to have the new form of stamped paper printed in conformity with it; that he sent down to Micheltorena, by express, in December, all the paper that was printed, that it might be rubricated by him; that all the paper ordered for the use of 1843 was printed in the latter part of 1842, and that the impression was made at one time; that he affixed his own rubric to it, and sent it all to the governor at one time. There were about two reams, of five hundred sheets each. In reply to the one hundred and forty-ninth question, the witness repeats that all the acts necessary for habilitation, viz. the printing, the applying the seal of the custom house, and affixing his own rubric, were performed by him on the paper for use in 1843 in the year 1842, previously to his sending it to Micheltorena, at Los Angeles. He adds that the paper was returned back from Los Angeles early in the month of March. Henry Cambuston, by whom, as stated by both Castañares and himself, the paper was printed, swears that the paper on which the grants in these cases are written was printed by him in November or December, 1842; that he "knows for a certainty that it was printed either in November or December of that year;" that all the paper for 1843 was then printed—a form was set up, and as soon as all the paper was printed, it was taken down. The witness, in reply to the eleventh question, states that he knows positively that the two sheets exhibited to him, (the grants in these cases) are two of the sheets printed by him in November or December, 1842, for habilitation and use in the year 1843.

The importance of this testimony, if true, to the claimant is evident. The grant for four leagues, near Yerba Buena, is on habil-

itated paper. It is dated Los Angeles, February 27, 1843. But the proofs of its entire falsity are irresistible. So early as the year 1837, the necessities of the Mexican government had suggested the policy of obtaining a revenue from a tax upon sealed or stamped paper. The law on this subject, which was modified and in part repealed by the decree of April 30, 1842, is found in the archives, and it has been printed among the exhibits filed in these cases. By the eighteenth article of that law, all sealed paper for use in the departments was to be transmitted from the capital by the director general de rentas, who was, by the forty-first article, required to furnish, with the greatest promptitude, the necessary supplies to the governors of the various departments for distribution and consumption. It was, however, provided by that article that in cases of absolute necessity, and in the absence of sealed paper from Mexico, paper might be "habilitated" by the administrator general and the commissary, with the previous approbation of the governor. The habilitation was to be made by placing on the paper the stamp of the office, and expressing therein the class of the seal, its value, the bienio to which it belonged, the place and date, together with the signatures of the administrator and commissary, or political authority in the absence of the commissary. No sealed paper from Mexico seems to have been furnished to the department of the Californias. The paper was accordingly habilitated by the signatures of the administrator of the custom house and of the governor. But this habilitation required, as we have seen, the previous approbation of the governor. Micheltorena assumed the duties of that office on the 31st of December, 1842. It is therefore evident that he could not have given directions for the habilitation of paper in time to permit it all to be prepared, as stated by Castañares, in November or December of that year.

When it was in fact ordered, and at what time the habilitation was effected, is conclusively shown by the archives of the former government. In those archives is found the official correspondence of Micheltorena and Castañares with reference to the habilitation of paper for the year 1843. The first letter is from Micheltorena, and is dated Los Angeles, January 9, 1843. It is as follows: "The sealed paper provided by the last law upon the subject not having reached this department, you will proceed to habilitate as much as may be necessary, and distribute the same to the proper parties for the sale thereof. Michelt'a."

This letter is addressed to the administrator of the custom house at Monterey. On the margin of this order of Micheltorena is a note signed with the rubric of Castañares, and dated January 22, 1843. It is as follows: "Let the paper be sealed as required."

On the 15th of March, Governor Micheltorena again writes to Castañares, referring to his previous order of the 9th of January, and stating that up to that time (viz. March 15, 1843) no paper had reached Los Angeles. He thereupon reiterates his order to Castañares to "proceed immediately to its habilitation, and to distribute it to the various officers, together with a copy of the law on the subject, for publication, advising them that the only copy of the law is that which was transmitted to the custom house."

On the 5th of May, 1843, Castañares writes to the governor as follows: "Excellent Señor: I have the honor to transmit herewith to your excellency twenty-five sheets of the first class, forty of the second, fifty of the third, one hundred of the fourth, and one hundred and fifty of the fifth, in order that you may place your rubric thereon, and order the same to be forwarded to the prefect of the Second district, that they may be distributed to the courts under his jurisdiction," etc.

On the 6th of June, 1843, Governor Micheltorena acknowledged the receipt of the paper transmitted by Castañares on the 8th of May. His letter is as follows: "With your official communication of the 8th ultimo, I have received twenty-five sheets of the first seal, forty of the second, fifty of the third, one hundred of the fourth, and one hundred and fifty of the fifth, the distribution, collection and account of which I have committed to the charge of the prefecture of the Second district, for the reason that the office of the military paymaster has to be removed. Man'l Michelt'a. God and Liberty. Los Angeles, June 6, 1843. To the Administrator of the Maritime Custom House of Monterey."

In the exhibit in which these letters are contained is a large number of official communications relating to the distribution of the sealed paper among the various officers. On the 30th of May, Castañares transmits a number of sheets to the justice of the peace of San Juan Bautista. On the 29th of June, he transmits sealed paper to the sub-prefect of San José, and on the 20th of December he informs the governor that he had forwarded sealed paper to those officers, in obedience to his order of the 15th of March. The distribution of the sealed paper transmitted to Los Angeles by Castañares on the 8th of May, and the receipt which the governor acknowledges on the 6th of June, are also shown by the official correspondence of the governor with the prefect, and of the latter with subordinate local authorities. On the 3d of June the governor transmits to the prefect of the Second district all the paper he had received from Castañares. On the 5th of June the prefect acknowledges its receipt. On the 6th of June the prefect transmits a portion of it to the justice of the peace for distribution. On the 7th the justice acknowledges its receipt. The transmission of sealed paper to, and the receipt of it by other justices, are shown by their official letters contained in the same exhibit.

The genuineness of all this correspondence is unimpeached. The signatures and rubrics of Castañares and Micheltorena are proved. The correspondence is found in the archives among the records of the government, where the official letters of Micheltorena's administration are preserved. But the facts disclosed by these letters do not rest upon the evidence afforded by them alone. All the grants issued by Micheltorena at Los Angeles from the beginning of his administration up to May 20, 1843, have been exhibited in evidence. All of them are upon unhabilitated paper. The only documents dated previously to June 6, 1843, which are on habilitated paper, are the petition and the grant in this case. On the 22d of February, J. J. Sparks presented his petition for a title on unhabilitated paper. On the margin of this petition is an order by Micheltorena, dated March 16, 1843, in which he directs the petition to be returned to the interested party in order that he may renew his application "as soon as it is known that new sealed paper has arrived at Santa Barbara, (which will be issued soon) to avoid the necessity of duplicating all the documents." The petition seems to have been accordingly returned, and on the 6th of June, the very day on which Micheltorena acknowledges the receipt of sealed paper from Castañares, Sparks renews his application on habilitated paper, and the title was subsequently issued to him. If further proof on this point could be deemed necessary, it is found in the testimony of Pablo de la Guerra, a witness of unimpeachable character, who swears that when he reached Monterey in January, 1843, no sealed paper had yet been printed.

No attempt has been made by the claimant to rebut the proofs on the part of the United States which have been referred to, or to reconcile the existence of the facts shown by them with the possible genuineness of the four-league grant.

They establish beyond all doubt, not only the falsehood of the statements of Castañares and Cambuston with respect to the habilitation of paper for 1843, but they show that at the date of the petition for the four-league grant, viz. January 10, 1843, and at the date of the grant itself, viz. February 27, 1843, the very paper on which they are written was not in existence.

But the statements of Castañares and Cambuston with regard to this paper are shown to be untrue in another respect. They both swear positively, as we have seen, that the paper for 1843 was all printed at the same time; that one impression was made and the form was then taken down. Castañares swears that all the paper so printed was sent by him to Micheltorena and received back in March, at one time. The habilitated paper for 1843 has been subjected to a minute examination. It is proved beyond all doubt by the testimony of Truesdell and Tennent, that the paper on which these grants are written could not have been printed on the same form as that on which other habilitated paper for that year was printed. It would be tedious to recapitulate the numerous differences in the shape of the letters, in the length of the words, in the distances between the words, between the letters, and between the lines, on which this conclusion is founded. It is enough to say that it is clearly established, and is visible on inspection. It serves to confirm the statement of Pablo de la Guerra that the paper was printed during the year 1843, at different times, and as it was wanted.

With regard to the transmission of all the sealed paper to Los Angeles, and its return in March, 1843, at one time, Castañares' statement is also disproved None of it was, as we have seen, transmitted by him until May 8th, and the precise number of sheets sent is mentioned in his letter of that date, in the reply of Micheltorena acknowledging its receipt, June 6, 1843, and in the letter of the governor to the prefect to whom he transmitted it for distribution. But that Castañares did not send it all to Los Angeles is evident from the receipt of Salvador Munras for more than two hundred sheets from the custom house at Monterey, dated May 22, 1843, and from Castañares' letter of May 30th to the justice of the peace of Monterey, transmitting to that officer a portion of the paper. The evidence is further confirmed by the fact that a majority of the documents for the year 1843, found in Monterey, are on paper habilitated by Castañares alone, which is inconsistent with the supposition that all the paper, after being rubricated and sealed by Castañares, was transmitted to the governor for his rubric, and by the latter returned, after being rubricated, to Monterey. The falsehood of Castañares' statements on other points in these cases will hereafter be shown, in connection with other branches of their investigation.

It is to be observed that the evidence of fraud afforded by the proofs with regard to the habilitation of the paper can only be applied to the first grant to Limantour; his second or Islands grant being dated in December, 1843, at a time when habilitated paper for that year was undoubtedly extant. We proceed to consider the evidence more particularly applicable to the Islands grant. This grant bears date on the 16th of December, 1843. Among the claims presented by Limantour to the board is that for Laguna de Tache, dated December 4, 1843. This grant purports to be made in consideration of his valuable services and loans in money and effects. The Islands grant purports to be made in payment of duties advanced by Limantour on the cargo of the Ayacucho, which was shipwrecked; and also in consideration of services rendered by him on divers occasions to the department. The petition found in the expediente in this case is signed by Limantour, and dated De-

cember 12, 1843. It is shown beyond controversy that neither at the date of this petition, nor for three months previously, had Limantour been in California, and that he did not arrive here until July, 1844. It appears in proof that, in the fall of 1841, the Ayacucho, a vessel belonging to Limantour, was wrecked off the Punta de Reyes. The goods saved from the wreck were stored in the house of Captain Richardson, and the greater part of them were subsequently sold by Limantour. In the fall of 1842, or beginning of 1843, he undoubtedly made considerable advances to Micheltorena, who had been furnished by the government, in addition to the ordinary resources of the department, with a credit on the custom house at Mazatlan for $8,000 per month. Drafts in favor of Limantour for $10,221 were accordingly drawn by Micheltorena on that custom house, which were, on the 24th of May, 1843, ordered by the supreme government to be paid, as appears by the official letter of the minister of war and the navy, communicated by the minister of the treasury to the treasurer general of Mexico, and by the latter department transmitted to the treasurer of the department of the Californias, among the records of whose office it is found.

It may here be remarked, that so far as it appears from the archives, the payment of this draft was a complete settlement of all accounts between Micheltorena and Limantour for the advances which had been furnished by the latter. It is probable that on the receipt of these drafts, Limantour immediately proceeded to Mexico to obtain the order for its payment, which we have seen was issued on the 24th of May, 1843. It is at all events clear, if the testimony adduced by himself is to be relied on, that in the months of April, June, and December of 1843, he was in Mexico.

The ratification or approval in the margin of the grant for two leagues at Yerba Buena, signed by Bocanegra, is dated April 18, 1843. This instrument states that, in consideration of the services rendered by José Y. Limantour, the supreme government approves the grant made, and it confirms the property granted, of which this document (that is, the grant) makes mention, which is returned to the party interested. In the "advertencia" or note appended to the "acuerdo" or ratification produced by Castañares, it is stated that "the supreme government has heretofore ratified and approved the grant made to the foreigner Limantour, setting down upon the original titles themselves said ratification and approbation, and returning them to the party interested, in the months of April, June, and December of 1843, and June of 1844."

It cannot, I think, be doubted that in these documents it was intended to be stated that the titles, with the ratifications appended, were delivered to the interested party in person at the time mentioned. No proofs have been offered to show that the titles were sent to Mexico by Limantour, while he remained in California. If such had been the case, his messenger would no doubt have been produced; or, at least, the fact that the documents were sent to Mexico would have been somewhere suggested in the evidence. But the testimony of Castañares and Keenan, the claimant's own witnesses, places this matter beyond doubt. Castañares states that from the middle of September, 1842, when he entered upon his office as administrator of the custom house at Monterey, he remained in that city until the beginning of December, 1843, with the exception of a trip to Los Angeles, in the early part of November, 1842. He further states that he sailed in the bark Clarita for the port of San Pedro, in Upper California, and that he there embarked on the Trinidad for San Blas. The records of the custom house show that the Clarita sailed from Monterey with Don Manuel Castañares and family on board as passengers, on the 13th of December, 1843. In reply to the one hundred and thirty-ninth question, he says that at the time he left Monterey in the Clarita, Limantour was not in Monterey, nor had he seen him there within the three or four months preceding. James Keenan, a witness produced by the claimant to prove that in 1843 Limantour spoke of his having "lands and property in California," states that the conversation to which he refers occurred on the road between the city of Mexico and San Juan de los Lagos, in the latter days of November, 1843. To this testimony may be added that of Jacob P. Leese, who states that Limantour sailed from this country for Mexico early in 1843, in a schooner which he had purchased, and which was laden with aguardiente, and that he did not return until 1844.

But the precise date of Limantour's return to California is shown by his own memorial to the administrator of the custom house, on the subject of the seizure of the cargo of the Joven Fanita for want of a register. In that memorial he states that on the 20th of April, 1844, he sailed from Mazatlan in the Joven Fanita for San Pedro and Santa Barbara, in Upper California; that on the 16th of May he discovered that his register had been eaten by rats; that on arriving at San Diego he presented to the captain of the port the fragments of the register, and other documents. He therefore asks the administrator of the custom house to consider the embarrassment in which he is, and to do what may be proper in the premises. The various documents by which this petition was accompanied, the order of the administrator of the custom house, the certificate of the packages contained in the cargo, the very fragments of the document alluded to by Limantour, and, finally, the order of Micheltorena, by which he took

possession of the goods, under an engagement to account to the custom house for their estimated value, in case they should prove to have been liable to confiscation, are all found in the archives, having every mark of genuineness.

In the "carpeta" or bundle of documents presented by Limantour, with his memorial to the custom house, are the "guias" or certificates from one custom house to another, stating that the proper duties have been paid on the cargo therein referred to. By these documents it is shown that on the 24th of January, 1844, Limantour was at Colima, bound for San Pedro, with goods. On the 8th of March, 1844, he was at Guadalajara with goods, shipped on the Joven Fanita for the ports of San Pedro, Santa Barbara and Monterey. This fact is shown by an invoice dated at Guadalajara on the 8th of March, and signed by himself. On the 24th of March, 1844, he was at Tepic with goods, bound for Monterey. On the 26th of March, 1844, he was at San Blas. On the 17th of April he was at Mazatlan, bound for San Pedro, in the Fanita. On the 16th of May, 1844, he was in latitude 22° 27′ N., and longitude 119° 44′ W., on the Joven Fanita, bound for San Pedro. On the 29th of July, 1844, he was in Monterey, soliciting the release of his cargo. These last two positions appear from Limantour's memorial to the custom house, already referred to.

The importance of establishing the position of Limantour at these dates will hereafter appear, when we revert to the testimony of Castañares on the other branch of the case. It is sufficient here to observe, that it is evident from the statement of Castañares himself, that neither the petition of Limantour for the Islands grant, dated at Monterey on the 12th of December, 1843, and which is signed by himself, nor the grant for Laguna de Tache, dated December 4, 1843 (a copy of which was presented to the board for confirmation, but which was abandoned without proof), could have been written at the time they bear date.

We now approach the consideration of a part of the evidence applicable to both the grants under investigation by which it is urged by the United States the forgery of those documents is conclusively established. The testimony referred to is that which relates to the seals. It is proved by the testimony of Pablo de la Guerra, and Castañares admits the fact, that there was but one seal in the custom house of Monterey, which was used on official documents. The impressions of this seal on documents of undoubted authenticity from the archives have been compared with those found on the grants and petitions produced by the claimant in the cases under consideration. It is shown beyond all doubt that the two classes of impressions could not have been made with the same seal. It would be tedious to detail the numerous differences pointed out by the witnesses be-

tween the genuine seal and that found on the grants in question. They are readily detected on attentive examination, and are distinctly discernible in the photographic fac similes which have been exhibited in the cause. Among all the impressions, amounting to upwards of a thousand, of the custom house seals found on various documents in the archives for the years 1843 and 1844, impressions similar to those on the papers in these cases are found on but eight other documents.

An examination of these documents will, however, show that the existence of these seals upon them strengthens the proof of the fraud alleged in this case. The first is the expediente in the case of the alleged grant to Limantour of eighty square leagues at Cape Mendocino. In this case the original grant was not produced, and the claim was rejected by the board, and has been abandoned by Limantour. The petition which is produced is dated Monterey, December 16, 1844. It is in the handwriting of Limantour. The paper on which it is written is habilitated by the rubrics of Micheltorena and of Pablo de la Guerra, who was then administrator of the custom house. Pablo de la Guerra testifies that the rubric attached to his name is not his genuine rubric, nor was it placed there by him. We shall hereafter see that this document is not the only one produced in this case which bears the forged rubric of Pablo de la Guerra.

The next is the grant to Antonio Chaves. The claim in this case was presented by Limantour as assignee of Chaves. No proof of any kind was adduced in support of it. It was accordingly rejected by the board. The assignment under which Limantour claimed is dated at Monterey on the 1st of February, 1844, and is signed by him as well as Chaves. The latter, in his deposition, states that the consideration for the assignment, viz. five hundred dollars, was paid by Limantour to him on that day. We have already seen that Castañares swears positively that Limantour was in the city of Mexico in the month of February, 1844, and that in fact he was, on the 1st of February, neither there nor at Monterey, but on the road between Colima and Guadalajara. It is therefore impossible that the assignment could have been made on the day it bears date; or that Chaves' statement with regard to the payment of the money by Limantour can be true. The subscribing witnesses to this assignment are Manuel Castro, Francisco Pico and Francisco Arce.

The third is the petition of Castañares for La Estrella. It is in the handwriting of Limantour. Castañares himself, though his name is attached to the petition, was, at the time of his examination, ignorant of its existence. He states that he applied to and obtained from Micheltorena two grants—one for lands near the beach of Juana Briones, the

other for a place called "Las Mariposas." In answer to the one hundred and eighty-eighth question he states positively that he never applied for any other grants in California than the two above mentioned.

The fourth document which bears the same seal as that on the Limantour papers, is the grant to Francisco Pico and José A. Castro. It purports to be signed by Micheltorena and M. Jimeno, secretary. In the index of land grants made by the latter officer, no mention of this grant is to be found, although a grant made on the very day (December 29, 1843) on which this grant purports to have been made is duly indexed. No expediente was produced in this case. The court, though entertaining and expressing much doubt as to its genuineness, confirmed the claim, not conceiving itself at liberty to substitute its suspicions for the positive testimony of the witnesses who testified to its genuineness. Those witnesses were Francisco Arce, Vicente P. Gomez and José Y. Limantour. It is proper to add that at the time the discrepancy in the seals had not been discovered.

The fifth document is the grant to Ramon and Francisco de Haro. In this case, which has not yet been submitted for decision, the deposition of Vicente Gomez has been taken. This witness confessed on the stand that the original grant produced by the claimants had been written by himself in 1850. That at that time it had neither the rubrics of Micheltorena nor of Castañares at the top, nor the signature of Jimeno at the bottom. That the signature of Micheltorena was then very lightly traced. He adds that he did this at the request of a Mr. Gliddon, but that he had no idea "so ridiculous a thing would be presented in court." In order to test the truth of the witness' statement, and to ascertain whether he had, in confessing a forgery, committed a perjury, he, at the request of claimants' counsel, wrote out in the presence of the court what was dictated to him. The writing was found to be in all respects the same as that of the grant in question. As the proofs in this case are not yet closed, any further observations upon it would perhaps be inexpedient.

The sixth document on which the Limantour seal appears is the grant to Modesta de Castro. This case was rejected by the board of commissioners. In their opinion, the board say: "A paper purporting to be the original grant is filed in the case, and the genuineness of the signatures of the governor and secretary appearing on it are proven by the deposition of José Y. Limantour. This constitutes the whole testimony in the case. The grant refers to the original petition and map mentioned in the expediente in explanation of the boundaries. These documents are not produced, and from the index of the records of the former government, now in the custody of the surveyor general, it appears that none such exist in the archives." After alluding to the imperfect description of the land con-

tained in the grant, and the absence of any evidence of occupation or possession of the premises, the board add: "But independently of these considerations, there are a number of suspicious circumstances connected with the grant itself, which we should not feel justified in passing over in silence. The grant purports to be made on stamped paper for the years 1844 and 1845. Upon comparing it with a number of grants of undoubted genuineness, made upon stamped paper for those years, it is found to differ in so many important particulars as to suggest strong doubts of its authenticity." These differences are then enumerated, and the board observe: "The rubrics annexed to the certificate of habilitation by Don Pablo de la Guerra are so different from those on the genuine paper, as to leave but little doubt of their being simulated." The opinion concludes as follows: "If, therefore, the claim were unexceptionable in other respects, we should not feel justified in entering a decree of confirmation on such a paper as this, without very strong testimony in explanation of the suspicious circumstances connected with it. The claim is accordingly rejected."

The seventh document on which this seal appears is the petition of Manuel Castro for a sobrante. This petition states that "in the location which was granted to Don José Limantour, called 'Laguna de Tache,' there results considerable surplus," etc. This reference to the grant to Limantour of Laguna de Tache might seem to afford some proof of the genuineness of the latter. This grant is dated on the 4th of December, 1843. The petition of Castro purports to be dated on the 7th of December, and the marginal order of Micheltorena on the 12th of December of the same year. Unfortunately, however, for the genuineness of either document, it appears that the dates of both the marginal order and the petition have been altered from October, as they were originally written, to December. The alteration is obvious on inspection. It is plainly exhibited in the photograph of the original, which has been filed. It has been so clumsily effected that the last syllables of the word Octubre still remain, and the word is spelled Decietubre instead of Deciembre. The allusion, therefore, in the petition of October 7th, to a grant made on the 4th of December, must have been prophetic. It ought to be added that the genuineness of the grant to Manuel Castro is testified to by William A. Richardson. The claim was rejected by the board.

The last document to be noticed is the petition of Ma. Antonia Pico de Castro. This petition, though in the name of M. A. Pico de Castro, is signed by her son, Manuel Castro, whose petition with altered dates, referring to the grant of Laguna de Tache, has just been noticed. No original grants or expedientes were produced by Limantour in any of the claims presented by him for confirmation, with the exception of the documents in the

cases now before this court, and the expediente in the Mendocino case for eighty leagues. As none of these documents, copies of which were presented to the board, have been exhibited in this court, it may be presumed that they bear the same seal as the other documents presented by Limantour, and that their production would not tend to establish the genuineness of the latter.

We have thus examined in detail each of the only documents on file in the office of the surveyor general which have the same seal as that on the papers in the cases under consideration. It is apparent that, so far from affording proof of the genuineness of the latter, the circumstances surrounding them are so suspicious as to corroborate rather than to weaken our convictions of the fraud imputed to the claimant. We have seen that all the grants presented by Limantour to the board for confirmation purport, with one exception, to have been made in consideration of his services to the department and of supplies furnished by him.

The evidence relating to the consideration on which the two grants submitted to this court are alleged to have been made, will now be adverted to. The principal witnesses relied on by the claimant to prove that the supplies, in payment of which the grants are said to have been made, were in fact furnished to Micheltorena, are Manuel Castañares and José Abrego. Manuel Castañares testifies that in the month of February, 1843, he received at Monterey a letter from Governor Micheltorena, informing him that he had made a contract with Limantour, from whom he had received certain amounts in money and clothing for his troops, and that in payment thereof he had given to Limantour drafts upon Mazatlan and upon the general treasury of Mexico, "having made to him some grants of land." Governor Micheltorena therefore requested the witness to write to Santa Anna, and to those ministers with whom he was on terms of friendship, representing the destitute condition of the departmental government, and recommending the payment of the drafts and the approval of the grants. He accordingly wrote to Santa Anna, Tornel, and Bocanegra as requested, —Santa Anna being at the time president; Tornel, minister of war; and Bocanegra, minister of external and internal relations and of government. Replies were received from these persons by the witness in December, 1843, stating that his recommendation had been complied with, and in that of Santa Anna it was added that Mr. Limantour had been authorized to make new loans to Micheltorena. Castañares further states that a few days after his arrival in Mexico, on his return from California, and in the month of February, 1844, Limantour visited him at his house and handed him a letter from Micheltorena, in which he (Micheltorena) informed the witness that he had received new supplies from Limantour, and recommended anew Mr.

Limantour to him (Castañares) in order that he should procure the payment of the drafts given to Mr. Limantour in consideration of those supplies—Micheltorena having made to him (Limantour) new concessions of land by virtue of the authorization he had received from the Mexican government. The witness further states that in the year 1844, and some three or four months after his meeting with Limantour in February, the latter showed him two titles for land in California, which he recognizes as those produced in these cases.

Such is in substance the statement of this witness with regard to the consideration on which these grants were founded. The flagrant falsehood of his evidence with regard to the habilitation of paper for the year 1843, which has already been exposed. might well relieve us of the task of examining this portion of his evidence, resting as it does on his own unsupported assertion. Some observations upon it, however, may not be inappropriate. Neither the letter which he testifies he received from Micheltorena at Monterey, nor that handed to him by Limantour in February, at Mexico, are produced, nor is Castañares able to state with certainty whether or not they are still among his papers in Mexico, although he thinks it probable they are. (Answer to the nineteenth interrogatory.) We have already seen that the sole object of the visit of this witness to California was to give his evidence in these cases. If, then, he had really received letters from Micheltorena, it is incredible that he should not have searched for, and if possible, brought them with him. He could not have been ignorant that they would have afforded the most decisive evidence of the genuineness of the claims he came to establish, and would have corroborated his own statements by the most unquestionable and satisfactory proofs. The failure to produce these letters, and the inability of the witness even to state with certainty that they still exist, indicating that he has never searched for them among his papers, is a circumstance of itself sufficient to make us doubt the truth of his entire statement. We have seen that Castañares testifies positively that the letter of Micheltorena, informing him of further concessions of land to Limantour, was handed to him by the latter in Mexico, a few days after his (Castañares') arrival from California, and that Limantour showed him his titles some three or four months afterwards, in the same city. But the documents presented by Limantour himself to the custom house at Monterey, and found in the carpeta attached to his memorial, conclusively establish that at neither of the dates mentioned by Castañares could Limantour have been in the city of Mexico. On the 24th of January he was, as we have seen, at Colima; on the 8th of March, at Guadalajara; on the 24th of March, at Tepic; on the 26th of March, at San Blas; on the 15th and 17th of April, at Mazatlan; on the

16th of May, he was at sea, and on the 29th of July, 1844, he was at Monterey. I have been unable to conjecture any answer that can be suggested to the proofs thus afforded of the falsehood of Castañares' statements.

The second witness on whom reliance is chiefly placed by the claimant to prove the consideration on which these grants were made, is José Abrego. This witness states that all the accounts between Micheltorena and Limantour passed through his hands as commissary of the department; that the form in which the accounts were kept was substantially as follows: In one column were charged against Micheltorena all the moneys which came into his hands to be used as public funds. In an opposite column were credited to him all the disbursements he made. The whole amount received by him from Limantour, at various times, was $70,000 or $80,000, with which Micheltorena stood charged in the accounts, and he stood credited in the accounts with $56,000 or $66,000. These credits were of drafts on Mazatlan, and perhaps other places, and there was also a charge against Limantour, which stood as a credit to Micheltorena, of a certificate for lands in Upper and Lower California, for upwards of $6,000. In this certificate, which was to be sent to Mexico, it was stated that according to the accounts of General Micheltorena, he appears to have received from Señor Limantour upwards of $6,000 for certain lands granted to him by the departmental government, according to titles which have been given him. This certificate the witness swears was signed by himself, by Micheltorena's order, and given to Limantour about a year before Micheltorena left the country. It was required by Limantour, the witness states, in order that he might obtain the approval of the supreme government of Micheltorena's acts in the premises.

It is proved beyond all doubt that nearly all the foregoing statements of José Abrego are false. Since his deposition was taken, the accounts of Micheltorena's administration, with the books of the treasurer, Abrego, have been found in the archives. They consist of (1) a book of entries for 1841; (2) a book of entries, cortes de caja for 1843; (3) corte de caja for 1845; (4) a book of entries for 1844; (5) a book of entries for 1845; also, two books of entries by José Abrego for 1841 and 1842. These books have been produced in court by Mr. R. C. Hopkins, the keeper of the archives. He testifies that he has carefully examined them, and he states the form in which they were kept. It appears from his testimony and from inspection of the books themselves, that they were prepared in Mexico, the first and last pages being signed by the "director general of rentas," and the intermediate ones by the "contador." There were kept (1) a book of entries of amounts paid out; (2) a book in which were entered the amounts received

each month, and also the amounts paid out each month, showing the balance on hand at the end of every month. The items or entries are in every case authenticated by the signature of José Abrego, and sometimes by that of the party receiving the payment. There were also monthly and yearly balance sheets made out and examined and audited by the governor, or in his absence by some other officer.

Mr. Hopkins proceeds to state that he has carefully examined these books of the commissary department for the years 1842, 1843, 1844, and 1845, and that they contain no entry whatever of any transactions between Limantour and Governor Micheltorena. That this statement is accurate, is evident from the books themselves, printed copies of which have been filed as exhibits in the cause. An inspection of the books also discloses the fact that the description given by Abrego of the mode of keeping the accounts is untrue. It is stated by him, as we have seen, that there were two columns of items, the one containing charges against Micheltorena of moneys received by him; the other, credits to him of disbursements made by him. The books show that the accounts were kept in the form of receipts for disbursements, which were entered in the book and numbered. All the receipts from the same party being placed in a carpeta or bundle, on the outside of which was an abstract of its contents.

All the accounts of Micheltorena's administration appear to have been handed to Abrego at one time, and by him entered in a book on the 2d of April, 1845. In this book the aggregate amount of the receipts or "partidas" is stated, and attested by the signatures of Micheltorena and Abrego. The number of partidas or separate entries is one hundred and eight, each of which is attested by the signature of José Abrego, and refers to the numbered receipts or vouchers contained in the corresponding "carpeta," or bundle of vouchers. These last have also been examined. They have been found to correspond in numbers and amounts with the entries or partidas which refer to them.

Of the authenticity of these books there can be no doubt. They are found among the archives of the former government. They contain intrinsic proofs of their own genuineness. They are attested by the frequent signatures of Abrego and Micheltorena. The statement of accounts in them precisely corresponds with the statement of Micheltorena's accounts made by Abrego himself to the departmental assembly, on the 15th of April, 1845, after the expulsion of Gen. Micheltorena, and which is found among the archives. And the account as stated in these books is carried into the "corte de caja," or balance sheet, made out on the 1st of January, 1846, also found in the archives. It is evident from inspection that there are no entries of charges and credits in opposite

columns, as stated by Abrego; that there is no charge in the books against Micheltorena of $70,000 or $80,000, or of any sum whatever, received by him from Limantour; that there is no credit in favor of Micheltorena of $56,000 or $60,000 for drafts on Mazatlan or other places, or an entry of or allusion to any such drafts; that there is no charge to Limantour and credit to Micheltorena of a certificate for lands in Upper and Lower California, for upwards of $6,000, nor any allusion to any such credit, charge or certificate; that the books contain no charge whatever against Limantour. And finally, that no certificate such as that mentioned by Abrego in his answer to the eighth question is, any where contained in his books. It further appears by the testimony of Mr. Hopkins, that no written order from Micheltorena to Abrego, directing him to make out the certificate to Limantour, can be found in the archives, nor any mention or allusion to it; that neither in the books of Abrego, nor in any book, paper or account in the archives, can be found any "item crediting Limantour," or any item crediting Micheltorena, as stated by Abrego. And finally, that there is found in the archives an official letter of Garcia Condé, minister of war and marine, addressed to the departmental treasurer, in which he acknowledges the receipt from the latter of the "balance sheet made in the treasurer's office on the 1st of April, 1845, showing the amount which Gen. Don Manuel Micheltorena distributed in that department while he was governor and commandante general."

The demonstration of the falsehood of Abrego's testimony is thus complete. It cannot be pretended that there were other books and accounts, which have disappeared. That the departmental treasury over which Abrego presided possessed no information of the amounts received by Micheltorena, is evident from Abrego's letter of the 15th of April, 1845, to the departmental assembly. After the expulsion of Micheltorena, an inquiry into the accounts of his administration appears to have been instituted by that body. A statement was therefore demanded of Abrego, which he accordingly transmits on the 15th of April, 1845. This statement or balance sheet precisely corresponds, as has been mentioned, in the items and amounts, with the archives; and in the communication to the assembly which accompanies it, Abrego says: "In compliance with the wishes of the most excellent departmental assembly, I inclose the balance sheet formed by this office, showing the amounts that his excellency Don Manuel Micheltorena distributed during the time he held the administration of this department, and also a copy of one of the entries of the return which is found in the books of this treasury —not having any other class of documents or information that can be given relative to the administration of his excellency before

mentioned. José Abrego. God and Liberty. Monterey, April 15, 1845."

If any explanation of the evidence, apparently conclusive of the falsehood of Abrego's testimony, were possible, it would surely have been offered by that witness himself. Since the discovery and production of his books he has not been recalled to the stand. Nor has any attempt been made to show that there were other books or accounts in this office, which in any respect corresponded to the description given by him of the mode in which they were kept, or of their contents. If the audacity and hardihood requisite to permit Abrego to make statements susceptible of a refutation so complete and apparently so easy should appear incredible, it is to be remembered that at the time his deposition was taken his books had not been discovered. They have since been found among a mass of other documents at the barracks of the United States troops at Benicia, where they have remained since the conquest of the country—four boxes of public papers, among which these books were found, having been recently removed from Benicia and placed among the archives by the United States district attorney, as detailed by that officer in his deposition. The same observations are applicable to the testimony of Castañares; for it was not until that witness' deposition was taken that the documentary evidence with regard to the habilitation of the paper was produced.

With such proofs of the falsehood of the more material parts of Abrego's testimony, comment on other portions of it might seem superfluous. It may however be observed, that his statement that the certificate given by him to Limantour was required by the latter in order to obtain the approval by the supreme government of Micheltorena's acts, is inconsistent with the facts alleged by the claimant to exist. Abrego states that this certificate was given in Monterey "about a year before Micheltorena left"—that is, in 1844. But if the facts are as contended for by the claimant, that approval had long since been obtained. The grant of four leagues at Yerba Buena had been approved on the 18th of April, 1843, and the grant returned to Limantour. The Islands grant had been approved on the 1st of March, 1844; and on the 25th of December, 1843, Micheltorena had, at Limantour's request, given him a certified copy of a dispatch from Bocanegra, dated October 7, 1843, in which the grants already made to Limantour were confirmed, and leave given to him to acquire further country, town or other property. In the advertencia or note appended to the "acuerdo" produced by Castañares, and bearing the rubric of Bocanegra, it is stated that "the supreme government has heretofore ratified and approved the grant made to the foreigner Limantour, setting down upon the original titles themselves said ratification and approbation, and returning them to the

party interested, in the months of April, June, and December, 1843, and June, 1844." It is evident, therefore, that on the claimant's own showing, the motive assigned for delivering the certificate to Limantour is absurd.

The examination of Abrego's testimony has not only exposed the perjuries of which that witness has been guilty, but it has incidentally disclosed the fact that no trace whatever of the alleged concessions to Limantour is anywhere to be found in the voluminous records and documents now remaining in the archives of the transactions of the former government of this country. The pregnant and almost conclusive negative evidence afforded by these archives will hereafter be adverted to. Before dismissing, however, the subject of the alleged consideration of these grants, a brief statement of the facts as they appear in official documents found in the archives may be necessary.

It is evident that in the early part of 1843, Limantour furnished to Micheltorena advances of money, perhaps derived from the sale of the cargo of the Ayacucho, which had been wrecked. In the correspondence of Governor Micheltorena with Manuel Castañares, the first letter is an order to the latter "to proceed to negotiate in the commercial market a loan in money for $10,000 or $12,000, hypothecating a certain percentage of the duties that may accrue from the vessels entering the port" of Monterey. This letter is dated January 9th. It is marked by the clearness, decision, and military brevity so conspicuous in all Micheltorena's dispatches, and which so strikingly contrast with the suppliant and almost abject tone of the letter addressed to Limantour, and produced by the latter, dated on the preceding day. It is difficult to believe that the governor, who on the 9th transmitted the brief and peremptory order to Castañares to negotiate a loan, could, on the preceding day, have written the imploring and almost piteous letter to Limantour, so lavish of promises to give him "drafts on Mazatlan," "contracts with the department," and "to enable his vessel to carry on a profitable trade," as well as grants of any vacant lands he might select, and begging him to "do him the favor to call and see him, that he might have the honor of conversing with him."

Whether the advances made by Limantour were obtained by Castañares, in compliance with Micheltorena's letter of the 9th of January, we cannot now ascertain. It is certain, however, that for his advances made about that time he received a draft on Mazatlan for $10.221. This draft was, as we have seen, ordered by the supreme government to be paid on the 24th of May, 1843. On Limantour's return to California in July, 1844, the cargo of the Joven Fanita was seized for want of proper documents. This cargo was not restored to him, but was taken by Micheltorena on the 18th of August,

1844, to supply his necessities. For these goods he received, on the 16th of May, 1845, from the general treasury of Mexico, a draft on the custom house at Mazatlan for the sum of $56,184.12½, as appears by the official communication on the subject, signed by A. Batres and Antonio Maria Esnaurrizar, and addressed to Abrego. On the receipt of this communication, an investigation was instituted by Abrego to ascertain what amount of goods from the Joven Fanita had in fact been received by Micheltorena. For this purpose the declaration of Larkin was taken, with whom the goods had been deposited, and by whom they had been distributed on the orders of Micheltorena. By Larkin's declaration, it appeared that the total value of the goods of Limantour received by him was $36,104.06½, according to an invoice in the handwriting of the former; but according to another invoice delivered to Micheltorena, their value was 29,032.4 reals. The investigation seems at this point to have been dropped.

It thus appears that for his advances in money Limantour was, in 1843, paid the sum of $10,221, and for the cargo of the Joven Fanita he was, in 1845, paid the sum of $56,184.12½, being, it would seem, an overpayment of about $20,000 above their value, as shown by his own invoice. Whether this over-payment was the result of a fraud upon the Mexican government, contrived by himself and Micheltorena, it is unnecessary to inquire. These two distinct transactions of Limantour with Governor Micheltorena, which are so clearly explained by the archives, seem to have been either by accident or design confused and blended together by his witnesses. The fact of their occurrence has no doubt suggested the plausible idea of founding the pretended concessions of land upon the consideration of supplies and advances furnished to the governor.

We will now direct our attention to the confirmations of those concessions said to have been obtained from the supreme government. The evidence of these confirmations originally submitted to the board consisted of the marginal memoranda on the grants themselves, and signed Bocanegra, and the certificate signed by Micheltorena and Jimeno, in which the dispatch of Bocanegra of the 7th of October, 1843, is recited. There has since been produced by Castañares a certified copy of the order in pursuance of which the dispatch is alleged to have been written, with the advertencia or note appended to it already referred to. With reference to the marginal memoranda or certificates, it is to be observed that they do not on their face purport to be the official act of any Mexican functionary. They do not profess to come from any minister or department of that government. They are authenticated by no seal; nor are they signed by Bocanegra as minister of any department of the Mexican administration. The fact of

the approval of the grants is stated in the certificates, and to those certificates the signature of Bocanegra is appended. It is only from other testimony, which shows that at the date of the certificates Bocanegra held a certain office in the Mexican government, that we are asked to presume these certificates to have been signed by him officially, and in the exercise of the duties pertaining to his office. Whether or not it properly belonged to the department of which he was minister to furnish such evidence as this of the action of the supreme government, and whether the mode in which they are signed in any respect corresponds with the provisions of the Mexican law, which provides for the manner in which the ministers are to perform official acts, is perhaps doubtful; but it is not now necessary to inquire. For the more important question is, did the Mexican government in fact approve these grants? whatever may be the informality or insufficiency of the mode in which that approval has been manifested.

With regard to the certificate purporting to have been given by Micheltorena to Limantour, in which the communication of Bocanegra is recited, it might be sufficient to say that it bears the spurious or forged seal found on the other papers exhibited in these causes. It may be observed, in addition, that it purports to be signed by Jimeno as secretary. But the document was not exhibited to Jimeno when he was examined as a witness, and we have already seen that Jimeno at the time his deposition was taken was ignorant that any grants whatever had been made to Limantour by Micheltorena. The pretended communication of Bocanegra, set forth in the certificate, refers to an official note of Micheltorena of the 24th of February, inclosing the memorial of Limantour, in which the latter asked of the supreme government permission to acquire property, etc. If Micheltorena had in fact written such a note, and if Bocanegra had answered it as set forth in the certificate, those communications would have been found in the archives.

An exhibit has been filed in these causes, in which all the circulars, decrees and dispatches of the supreme government with the department of Californias, from January, 1842, to December, 1844, are digested. The dates of the various papers are given, and a short statement of the contents. The very great number of these dispatches—the continuous and apparently unbroken order of their dates—afford the strongest presumption that all the official communications received by this department are preserved. It is almost needless to say that no communication from Bocanegra, such as that mentioned in Micheltorena's certificate, can be found amongst the numerous official dispatches of that officer. The communication set forth in the certificate is dated, as we have seen, on the 7th of October, 1843. Among the dispatches found in the archives is one from the treasury general of the Mexican republic, dated on that day, and two from the ministry of exterior relations and government, the department over which Bocanegra presided, and dated respectively on the 9th and 11th of October. It is to be presumed that the communication from the treasury general of Mexico was carried by the same mail or courier as that which brought the communication from Bocanegra of the same date, had the letter then been written. It appears, however, that the dispatches from the minister of exterior relations, of the 9th and 11th of October, were not received until the beginning of 1844. But the certificate of Micheltorena is dated December 25, 1843, and states that the communication recited had been received by the last mail. If there were no other circumstances in the case to prove the spuriousness of this document, I cannot but consider the negative testimony of the archives as almost sufficient of itself to lead us to that conclusion.

The document produced by Castañares, and alleged to have been copied from the archives of Mexico, remains to be considered. The convincing and unanswerable proofs of the falsehood of this witness' testimony, which have already been adduced, might well justify us in dismissing without further comment any document produced by him, and authenticated by his testimony. But there is intrinsic evidence of spuriousness in the document itself. In the note or advertencia appended to the acuerdo or order for the dispatch of the 7th of October, it is stated that the supreme government "had approved the grant made to the foreigner Limantour, setting down upon the original titles themselves said ratification and approval, and returning them to the party interested, in the months of April, June and December of 1843, and June, 1844." See the decisions (acuerdos) set down in the titles themselves, which were returned to him as decreed. It is evident that the person who prepared this document, in his zeal to furnish evidence of the ratification and confirmation of every grant which Limantour might pretend to have, has lost sight of the fact that the confirmations referred to as "set down on the titles themselves," could not by possibility have been given. Of all the titles presented by Limantour to the board, only one is dated prior to December, 1843, viz. the Four-League or Yerba Buena grant; and only two, viz. those presented in these cases, purport to have been confirmed by the supreme government. The confirmation of the Yerba Buena grant purports to have been "set down on the title," in April, 1843. But the confirmations stated to have been set down in June and December of that year, not only do not appear, but there were not at those dates, on the claimant's own showing, any grants in existence on which such confirmations could have been

inscribed. With regard to the confirmation stated to have been set down in June of 1844, it is sufficient to say that none such appears; the pretended confirmation of the Islands grant being dated on the 1st of March of that year.

It has already been mentioned that the archives of the former government, now in the office of the United States surveyor general, have been subjected to a thorough and minute examination. The voluminous documents which had remained in that office confused, in great part unknown, and practically inaccessible, have recently been collected, classified and arranged by Mr. Hopkins, the keeper of the archives, to whose intelligent and conscientious industry we are largely indebted for the information we have obtained respecting the administration of Gov. Micheltorena. The results of that examination are stated by Mr. Hopkins as follows:

"I have made a special search to discover, among the archives, handwriting similar to that in which the grants in these cases are written. I never found any grant or other paper in the archives in that handwriting. I have made a special search to discover any entry, memorandum or allusion to these grants among the archives. I find no mention or allusion to them, except in the expediente in the Islands case on file in the archives. In the Yerba Buena case there is an expediente found in Monterey by Vicente Gomez, which was not in the original archives. I have searched in the journals of the assembly for some allusion to these grants, but find none. I have also searched for the same purpose in the correspondence and miscellaneous documents of the former government, but find nothing. I find nothing whatever in the archives relating to these grants except the document that I have mentioned. I find nowhere any reference for an 'informe' of the Yerba Buena grant to any judicial officer. I find no report or any allusion to any report made in that case to the governor. I have made a similar search for reports, references or 'informes' in the Islands case. I find nothing except what is shown by the expediente. I have searched for the original confirmation of these grants, but I have found none, nor any mention of or allusion to it. I found no original communication from any department of the supreme government of Mexico referring or alluding to these grants. Among the original documents transferred to the surveyor general's office, on the dissolution of the board of land commissioners, are several petitions of Limantour for other lands in California. No original cases in those grants were filed I find no original grants to him anywhere in the archives, except those produced in those two cases. I have searched especially to ascertain the earliest dates at which sealed paper for the year 1843, habilitated by Micheltorena and Castañares, was used at Los Angeles. It was first used on the 6th of June, 1843. I have also searched to ascertain whether any land titles were issued by Micheltorena at Los Angeles in 1843 on paper purporting to be sealed paper for 1843, habilitated by Micheltorena and Castañares. I find only one,—the grant to Limantour in the Yerba Buena case, now before the court."

It is, of course, impossible justly to appreciate the force of the negative testimony furnished by the entire absence of any mention or allusion to the grants in the archives, unless the number, the character and the apparent completeness of those records, as they now exist, be considered. A slight examination of the documents contained in the printed volume of archive exhibits filed in these cases will show how full, voluminous, and it would seem complete, are the records of every important event during Micheltorena's administration. It would be tedious now to describe the large mass of orders, dispatches, decrees, circulars, official correspondence, reports, accounts, etc., which are printed at length, or a digest of which is given in the volume referred to.

Two records, more particularly relating to grants of land, may be noticed. Among the archives is a list headed as follows: "Index of lands adjudicated and persons to whom they have been conceded." At the foot of the list is a note in the handwriting of Manuel Jimeno, secretary of dispatch, and signed by him. In this list or index, which has long been known under the name of "Jimeno's Index," are mentioned the numbers of the expedientes, the names of the lands conceded, and of the persons to whom concessions are made. On comparing it with the expedientes found in the archives, it is found to correspond with them in all these particulars, with some exceptions, which are noted on the index itself. This list embraces land concessions from the year 1830 up to the 24th of December, 1844. No one of the alleged concessions to Limantour appears in this list. There is also found in the archives a book in which notes or "razones" of land grants during the years 1844 and 1845 are entered. No one of the grants to Limantour, purporting to have been made in those years and which were presented by him to the board, is noted in this book, although to four of them is attached the usual memorandum of the secretary, that "a register of the grant has been made in the proper book."

The total absence in the archives of all record, allusion to or trace of grants so numerous, extensive and extraordinary as the alleged concessions to Limantour, would, of itself, be sufficient to suggest vehement suspicions of their genuineness; but when taken in connection with the other proofs in these cases, it places their true character beyond any reasonable doubt. An examination, however, of the archives at Monterey has disclos-

ed some facts relating to these grants which deserve mention. By the testimony of Mr. E. L. Williams, the very intelligent recorder of Monterey, it appears that there are in his office about thirty documents purporting to be dated at Los Angeles. On all of these dated 1838 the name of that town is written Ciudad de Los Angeles, Angeles abbreviated, or Los Angeles. On none is the town styled as in the Limantour papers, "Pueblo de Los Angeles." It also appears that of all the papers and documents found at Monterey, no one bears the water marks which appear on the Limantour papers. It may also here be observed that the grant to Chaves, alleged to have been assigned to Limantour and presented as we have seen by the latter to the board, bears the same water mark as the certificate of Micheltorena already noticed. It also appears that on comparing the paper habilitated for the year 1843, found at Monterey, with that on which the Limantour and Castañares petitions are written, important differences exist. (1) The impression of the type on the topmost lines on the latter is smaller than that on the former. (2) On the Limantour and Castañares petitions the impression of the type is not shown upon the last page of the paper. On all the other papers this impression is visible on all the pages of each sheet, indicating that the sheet must have been folded when placed under the press.

These coincidences, though affording of themselves no conclusive evidence of the spuriousness of these titles, are yet significant as corroborating and confirming our conclusions drawn from other testimony, and as showing that every circumstance connected with them, even the most minute, points unmistakably in the same direction. Such is the result of the vigorous and thorough examination which has been made of the archives of this department. It is shown that the archives at the city of Mexico are equally silent as to the alleged concessions or confirmations in these cases. It appears that on the 4th of March, 1854, Mr. Cripps, the American chargé d'affaires at that city, addressed an official note to Bonilla, the Mexican minister of exterior relations, requesting to be informed whether any record or evidence of titles granted to José Y. Limantour existed in the archives of Mexico. To this note, Bonilla replies by enclosing to Mr. Cripps communications received by himself from the heads of the departments, to whom he had applied for the information required.

In the communication received from the minister of fomento it is said: "I have searched with the greatest care the documents to which the note of the señor chargé d'affaires ad interim of the United States refers, and I have not found any evidence whatever of the grant which might have been made to Mr. J. Yves Limantour by General Micheltorena, of four square leagues of land to the west of the bay of San Francisco, Upper California. Nor

is there any minute or evidence whatever of the approval of said grant by the supreme government, which, as it is said, has been authorized by Señor Bocanegra. Nor are there any titles of any other land which might have been granted to said Limantour in Upper California, and it is remarkable that there is not a single communication of Señor Micheltorena in which notice is given of grants of lands which he had made, whereby knowledge might be obtained in relation to those of the said Limantour." The communication from the ministry of war and marine, and from that of the general and public archives of the nation, are to the same effect, and in the communication of the minister of foreign affairs to Mr. Cripps, of the 6th of December, 1855, he informs the latter that the three offices of fomento, of war, and of the general archives, are the only ones where the evidences of the alleged grants could be found in the city of Mexico. He therefore refers Mr. Cripps to the archives of the public offices of California. How unproductive the search in these latter has been we have already seen.

It is worthy of note that the acuerdo and advertencia produced by Castañares purport to be among the archives of the ministry of fomento, the department from which the full and explicit communication just cited was received by Bonilla, and that they bear the certificate of the Manuel Orosco who, in 1854, as minister of the general and public archives, officially informed Bonilla that no documents relating to these titles could be found among the archives of his office. The evidence which has thus far been considered has established, it is conceived, beyond all question, that the titles of the claimant could not have been made at the time, in the manner, and under the circumstances alleged by him.

We will now briefly consider the direct and positive testimony, which discloses the time and place at which and the persons by whom they were fabricated. The witnesses who testify on this point are François Jacomet and Auguste Jouan, of whom the former was a clerk in the house of Robin & Co., Mexico, of which Limantour was a partner, and the latter was an agent of Limantour in California. Jacomet testifies that in the fall of the year 1852 he saw W. A. Richardson, who was then in the city of Mexico, in frequent consultation with Limantour; that he does not know the nature of their business, but that on one occasion he saw them making a plan, for which they borrowed from himself a box of instruments; that Micheltorena frequently came to the house, and after being closeted with Limantour came out with an order of Limantour on the witness for money; that he saw Micheltorena writing at a table, on which were some sheets of Mexican paper having stamps upon them not of the year in which he was writing; that he saw Emile Letanneur writing on this paper after Micheltorena had written upon it; that he also paid on the order of Limantour four hundred dollars to Mr.

Bocanegra, and that he knew of no business transactions between them up to that time. The witness adds, that a quarrel having arisen between Limantour and Robin, his partner, the former exhibited to the witness a letter of Robin, in which he threatened "to denounce Limantour as a maker of false instruments, and that he would denounce not only him, but his accomplice, Mr. Bocanegra; that Limantour was exasperated at the charge, and said that if he continued to abuse him in that way, he would, through the influence of Mr. Bocanegra and others, have him put into prison."

Auguste Jouan testifies that in March, 1852, at the city of Mexico, Limantour exhibited to him some four or five titles for land in California signed by Micheltorena, one of which was in the name of Limantour, the others in those of various persons; that Limantour proposed to him to go to California, find out where the lands were, (on which point Limantour could give him no indication) and make a survey of them; that he accordingly went to California, where Limantour also arrived towards the end of 1852; that on the arrival of Limantour, they had frequent conversations in regard to his titles; that he (the witness) expressed surprise at seeing titles of land shown to him by Limantour which he had never seen before, and that he conversed "freely with him without dissimulation" as to their being fraudulent; that when Limantour gave him the titles for translation, he noticed that on the Islands grant the ratification by Bocanegra was dated in 1843, while the grant itself was dated in 1844; that on calling Limantour's attention to this discrepancy, he was told by the latter to erase the figure "3" in the date of the ratification and substitute the figure "4." This he accordingly did, in the presence of Victor Prudon, but intentionally in so rough a manner that a hole was left in the paper, and that he had not seen the paper from that day until it was exhibited to him at his examination, after he had made the foregoing statement with regard to it. The witness also states that Limantour gave him for translation fourteen titles, none of which were identical with any of those he had previously seen in Mexico. The witness further states the substance of various conversations between himself and E. Letanneur, in which the latter gave an account of the place and time at which these titles were fabricated and signed by Micheltorena and Bocanegra, but as the admissibility of these conversations is questionable, it is unnecessary to dwell upon them. The witness further states that on Limantour's arrival, he saw in his possession a bundle of papers covered with black glazed cloth, with the official seal of the French legation stamped upon it, directed to M. Dillon, consul of France in San Francisco; that Limantour at the time said it contained papers; that he again saw this bundle at the St. Francis Hotel, when Letanneur opened one of Limantour's trunks; that

Letanneur then told him it contained about eighty blank titles and petitions, all signed by Micheltorena, and which were the same as those used by Limantour for his California land titles. About two days after he was in company with Limantour and Letanneur at the hotel, when Limantour informed them he was going to dine with M. Dillon, and both Letanneur and Jouan remarked that he carried under his overcoat the bundle directed to M. Dillon which he had seen on board the steamer and again at the hotel. He adds that Letanneur assured him that M. Levasseur, the French minister, had no knowledge that the official seal had been used in this manner, and that Limantour had obtained it fraudulently, etc. He also states that in his (witness') conversations with Limantour, the latter "never denied, but on the contrary, always admitted" that his titles were fraudulent; and finally, that Letanneur gave him, before he embarked for Mexico, four of the blank titles which, as he said, he had taken from the bundle before described, being induced to do so by Limantour's statement that each one was worth in California $10,000. That Limantour subsequently offered him $1,000 if he would surrender them, which he refused.

I have not thought it necessary to detail at length the positive, frequent and circumstantial statements contained in this deposition relative to the admissions by Limantour of the fraudulent character of the titles. If his testimony is believed, there is an end of the case. But as he, by his own showing, was an agent and accomplice of Limantour, his unsupported declarations are entitled to but little weight. We will therefore consider how far they are corroborated by other proofs. We have seen that Jacomet testifies that the grants are in the handwriting of Letanneur, and Jouan states that Letanneur admitted to him he had written them. These statements are strongly corroborated by circumstances heretofore adverted to: The fact that nowhere in the archives can be found any writing similar to that of these grants; that the writing of Captain Maciel, who is said by the claimant's witnesses to have written them, is found on comparison to be essentially different; that these grants are both in the same handwriting, although purporting to be made, the one at Los Angeles, and the other, after an interval of ten months, at Monterey, and though Maciel, according to the claimant's own witnesses, was only occasionally employed in the secretary's office; the spelling of the words "fundadero" and "estacado" and finally, the fact that Letanneur himself admitted the writing to be his, before a grand jury, though he subsequently denied it on the stand.

All these circumstances tend strongly to corroborate the testimony we are considering. The statement of Jouan with regard to Limantour's arrival with the forged titles in his possession, is corroborated by the fact

that not only all the petitions of Limantour to the board of commissioners, but all the petitions in the cases, the titles in which bear the spurious seal found on the Limantour documents, were filed in the months of February and March, 1853, with one exception— the petition of Josefa de Haro—which was filed on the 16th of March, 1852. But the title fabricated by Gomez, and bearing the Limantour seal, was not exhibited until 1854, having been then, as was alleged, recently discovered. Again, the Islands grant mentioned by Jouan as having been altered by him, exhibits the erasure and the hole in the paper described by the witness. No attempt has been made by the claimants to explain or account for this circumstance. The witness had given his testimony with regard to it before the grant was exhibited to him. The paper had been for several years in the custody of the surveyor general. It was not attempted to be shown that the witness had seen the document before giving his testimony.

But the strongest and most conclusive corroboration of the testimony of this witness is the fact that he produces one of the blank titles which, as he says, were taken by Letanneur from the bundle of documents in Limantour's possession. This title consists of a paper habilitated by the rubrics of Micheltorena and Pablo de la Guerra. On the margin is an order of concession signed by Micheltorena, the space where the petition is usually written being left blank. Attached to it is another paper habilitated in the same manner, the first, second and third pages of which are blank, except that on the latter is the signature of Micheltorena. The genuineness of Micheltorena's signatures and rubrics to these documents is established. The rubric of Pablo de la Guerra he pronounces a forgery.

I have been unable to conjecture any mode by which the existence of such documents can be reconciled with the possible integrity of the governor. If they were obtained by Letanneur, as stated by Jouan, from a bundle in Limantour's possession,—and Letanneur, though subsequently examined by the claimant, does not deny the fact, nor was he interrogated with respect to it,—they show that Limantour had in his possession the means and instruments for effecting the fraud charged upon him. And even if we regard the statement that they were obtained from Limantour as doubtful, they nevertheless remain in court, the mute but undeniable evidence of the fact that Gov. Micheltorena has been willing to lend himself to the fabrication of false titles, and to affix his name to documents which could only have been intended to be used for some fraudulent purpose. If all other proofs in these cases were wanting, the fact that documents are produced bearing the genuine signature of Micheltorena, and the forged rubric of Pablo de la Guerra, coupled with the fact that no trace of any

of the alleged grants to Limantour is found in the archives, would be sufficient to suggest vehement suspicions as to their genuineness. But our suspicions become certainties when these documents are shown to have been in the possession of the claimant himself about the time at which he first presented his numerous claims to the board for confirmation, and that among the papers so presented is found one (the petition in the Mendocino case) bearing the genuine signature of Micheltorena, and the forged rubric of Pablo de la Guerra, precisely resembling the blank documents produced by Jouan; when we find, also, on the petition of the Islands, that the marginal concession speaks of the "land solicited," while the "Islands" constitute the chief objects of the petition,— a form of expression which would hardly have been used had the marginal concession been written after, and with a knowledge on the part of the grantor of the contents of the petition.

We have, at length, reached the end of our protracted and laborious examination of the evidence in these cases. We have not thought it necessary to notice in detail much of the testimony which has been taken. In view of the conclusive evidence by which it is shown that these titles cannot be genuine, we have considered the testimony of the witnesses who state that at various times Limantour spoke of or exhibited these grants, as deserving of but little weight. In some instances these witnesses have, no doubt, intended to testify truly. But the date or the import of the conversations may have been inaccurately remembered, or Limantour may have then been contemplating the frauds he subsequently consummated. But no declarations of Limantour that he had titles for lands in California, no matter when, to whom, or how often made, can overthrow or even affect the force of the demonstration which has shown these titles to be spurious, and especially when to the evidence of those declarations is opposed testimony of his admissions of their fraudulent character, and the undoubted fact that from the conquest of the country until 1852, he neglected to assert or even give notice of his claims; and that on one of them he suffered a city to be founded, lots to be sold at extravagant prices, and buildings to be erected at great expense upon the land, for four years, during which he neither in person, by an agent, or by letter, or a public notice, apprised the inhabitants of his rights.

A brief recapitulation of the more important facts established by the proofs will conclude our labors. We have seen that the claims in these cases are but two out of eight presented by the claimant to the board for confirmation. The alleged concessions are found to be in all respects extraordinary and unprecedented, whether we consider the enormous extent of the land granted and its situation and importance to the government, the character of the grantee, or the considera-

tion on which the grants are alleged to have been made. To make any grant of land to a foreigner was a departure from an ancient and settled policy of the Spanish and Mexican governments; but to grant him the most important port on the Pacific, with every military position about it or commanding an entrance to it, was an act which, if committed, we may safely affirm was without parallel in the history of Mexico, or perhaps in that of any civilized nation.

The grants presented in the cases before the court are in their form as singular as in their object. They are unattested by the secretary, although every other grant made during Micheltorena's administration bears the signature of the secretary, as required both by custom and by positive law. They are in the same handwriting, though made at different places and with an interval of ten months between them, although the person who is alleged to have written them is admitted to have been employed only occasionally in the office. Among all the records of the former government, this handwriting nowhere else appears—a fact which increases the improbability that Maciel could have written these two grants only. His handwriting is found in the records, but it in no respect resembles the writing in these grants. And finally, two witnesses swear that the writing is that of Emile Letanneur, a clerk of the claimant. The grants are made without informes from any judicial officers. In the Islands case, none appears to have been asked. In the Yerba Buena case, it is recited that they were asked and obtained. No such reports or references to obtain them can be found in the archives. And it is shown by the testimony, and by the subsequent official acts of the officers themselves, that none could have been asked for or given. The only reference pretended to have been made, was by Jimeno to Richardson, an officer whose duties had no connection with the granting of lands, who at the time did not possess the confidence of the government, and who was shortly afterwards removed for misconduct in office. The letter purporting to be written by Jimeno, the secretary, is not presented to that officer, although examined as a witness, and he declares his ignorance that any grant whatever was made to Limantour, although he was secretary of the department, and although several of the grants presented by the claimant to the board bear his attestation,—a statement which is corroborated by the records of his official action on subsequent petitions for a part of the land embraced within these grants.

The expediente in the Yerba Buena case is found in 1852, in an office which was not its proper place of custody, by a person whose own confession in another case shows him to have been engaged in fabricating titles, and whose character to this court,

which has so often been called on to pass upon his credibility, no attempt has been made to vindicate. This expediente is shown to have escaped the notice of several persons whose duty or whose interest it was to examine thoroughly the records of the office where it is said to have been found, and a material part of the testimony of the only witness (Serrano) who pretends to have seen it in the office before its discovery by Gomez, is conclusively shown to be a deliberate falsehood. The expediente in the Islands case is found among the archives, but by whom, and when placed there, we know not. It is not numbered nor noted in Jimeno's index, nor referred to in any other document whatever. The expedientes in all the other cases which the claimant presented to the board for confirmation, and which were rejected, have disappeared, nor is any trace of such grants, or even of any application for them, to be found, with the single exception of the petition for eighty leagues in Mendocino county, for which the original grant was not produced, nor was any proof offered to establish it.

We find that all the documents presented by the claimant bear a similar seal; and that seal differs from the genuine seal elsewhere found on public documents. It is proved by the records themselves, by the testimony of an unimpeachable witness, and by the admission of Castañares himself, who as administrator of the custom house was its legal custodian, that there was but one seal during the years in which these grants purport to have been made; and the fact that this seal appears on eight other documents which are produced, corroborates, when those documents are examined, our convictions of its spuriousness.

With respect to the Yerba Buena grant, it is shown that the habilitated paper on which the petition and grant are written could not have been in existence at the time those documents are dated. This fact is established, not only by the official correspondence, which shows when the order for the habilitation was first given, and when it was executed and the paper transmitted to and received by the governor, but by the fact that no habilitated paper was used at Los Angeles until after the date when the correspondence shows it to have been transmitted, and that long subsequently to the date of the documents now produced, proceedings on an application for lands were suspended to await the arrival of sealed paper which had not yet been received. With respect to the Islands grant, it is shown that at the date of that grant, and also of the grant for Laguna de Tache, presented by Limantour to the board, but abandoned without proof of any kind, the alleged grantee was not in the country, nor had he been for several months previously, nor did he arrive until more than six months afterwards. The evidence by which this fact is

established is the testimony of the claimant's chief witness, Manuel Castañares, and documents presented and signed by Limantour and found among the archives.

With regard to the alleged consideration on which the grants are founded, it is shown that for any advances made prior to the first grant, Limantour received a draft on Mazatlan, which may justly be presumed to have been in full of all demands against the government up to that time; that he shortly after left the country, and did not return until above eighteen months afterwards, and therefore could not have made the advances or furnished the goods on which the two subsequent grants, made in 1843, purport to be founded, that no letter of Micheltorena, referring to such further advances, and stating that further concessions had been made, could have been delivered by Limantour to Castañares in February, 1844, in Mexico, because Limantour had not been in California to make the advances, nor was he in the city of Mexico in February, 1844, to deliver the letter. It is also shown that for his goods, which were taken in August, 1844, by Micheltorena, he was paid $56,-184.12½, being an overpayment of about $20,000. And, finally, that the statement made by Abrego as to the contents of his books, and the mode of keeping the accounts of the government, is conclusively disproved by the production of the books themselves.

With respect to the alleged confirmations, it appears that those inscribed upon the titles themselves are unattested by any seal; that they are not signed by Bocanegra, as minister, nor do they purport to be the official act of any Mexican functionary. It also appears that the certificate of Micheltorena, in which the dispatch of Bocanegra is recited, bears the spurious seal found on the other documents presented by Limantour. That, although it purports to be attested by Jimeno as secretary it was not exhibited to him when examined as a witness by the claimant, and he denies all knowledge of any grants whatever to Limantour. That neither the alleged letter of Micheltorena, to which Bocanegra's dispatch purports to be a reply, nor the dispatch of Bocanegra is found in the archives, nor any mention of or allusion to it, although a dispatch from the treasury general of the same date, and two dispatches from Bocanegra's own department, dated a few days subsequently, are found in the archives among the official letters of Micheltorena's administration. It also appears that these last communications, although relating to a most important subject, were not received until long after the time when, according to Micheltorena's certificate, the dispatches approving of the concessions to Limantour had reached California; and the custom house record of arrivals during the months of November and December, 1843, renders it almost certain that no dispatch dated in Mexico on the 7th

of October, 1843, could have reached California on the 23d of December of the same year.

With regard to the "acuerdo" or order from the archives of Mexico, with the "advertencia" or note attached to it, produced by Castañares, it is evident that the statements made in the latter are untrue. For no ratification could have been "set down on the original titles themselves in the months of June and December, 1843," for the reason that no titles were in existence in the month of June but the Yerba Buena grant, of which the approval is dated April 18th; and the two grants dated respectively December 4 and December 16, 1843, could not have been presented to the supreme government of Mexico in the same month as that in which they are dated. Nor do these grants, nor any others presented by Limantour, purport to bear "confirmations set down upon them" as stated in the "advertencia," for the grant of the 4th of December, 1843, (Laguna de Tache) has no approval whatever inscribed upon it, and that of the 16th of December (the Islands grant) has an approval dated March 1, 1844. It also appears from the communications addressed by the minister of exterior relations of Mexico to Mr. Cripps, the United States chargé d'affaires, that search has been made in the only three public offices of that republic in which evidence relating to the titles of Limantour would be found if it existed, and that those archives are as barren of all record or trace of those letters or confirmations as are those of California.

And, finally, we have the positive testimony of two witnesses, the one a clerk and the other an agent of Limantour, who identify the handwriting of the grants; and one of whom describes the private interviews of Bocanegra, Micheltorena and Limantour, and states the amount of money paid to the former on the order of the latter; while the other, in addition to his evidence of the frequent admissions by Limantour of the fraudulent character of these titles, produces in court a blank petition and grant bearing the genuine signatures of Micheltorena and the forged rubric of Pablo de la Guerra, demonstrating that Limantour had in his possession papers which not only afforded the means of committing the frauds charged upon him, but which could not have been prepared for any honest purpose. If to all this be added the fact that the testimony of Prudon, Serrano, Cambuston, Abrego and Castañares, the chief witnesses of the claimant, has been shown in almost every important particular to be false, we are justified in asserting that the proofs in these cases have the force and certainty of a demonstration.

On reviewing the whole case, it is not easy to confine within the limits of judicial moderation the expression of our indignation at the fraud which has been attempted

to be perpetrated. Whether we consider the enormous extent or the extraordinary character of the alleged concessions to Limantour; the official positions and the distinguished antecedents of the principal witnesses who have testified in support of them, or the conclusive and unanswerable proofs by which their falsehood has been exposed; whether we consider the unscrupulous and pertinacious obstinacy with which the claims now before the court have been persisted in—although six others presented to the board have long since been abandoned—or the large sums extorted from property owners in this city as the price of the relinquishment of these fraudulent pretensions; or, finally, the conclusive and irresistible proofs by which the perjuries by which they have been attempted to be maintained have been exposed, and their true character demonstrated—it may safely be affirmed that these cases are without parallel in the judicial history of the country. It would have been more agreeable to the court, and would have lessened its labors, had any argument been addressed to it in behalf of the claimant. But the counsel who had principally conducted the case for Limantour, shortly before the hearing announced that they had retired from the case. No reason for this step was assigned; but the court was not at liberty to treat it as an abandonment of the cause from any conviction on the part of those gentlemen of its fraudulent character.

The remaining counsel, though he attended at the hearing, and was invited by the court to submit a brief on behalf of the claimant, declined to do so. The court has therefore felt it to be its duty to give to the evidence a more elaborate examination, and to set forth the grounds of its decision at greater length than would otherwise have been necessary. It is no slight satisfaction to feel that the evidence has been such as to leave nothing to inference, suspicion or conjecture, but that the proofs of fraud are as conclusive and irresistible as the attempted fraud itself has been flagrant and audacious.

[José Y. Limantour was indicted for presenting a fraudulent land grant. See Case No. 16,138.]